## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAM B. GEROLD, Individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>vs.<br><br>CELGENE CORPORATION, MARK J. ALLES, RICHARD W. BARKER, HANS BISHOP, MICHAEL W. BONNEY, MICHAEL D. CASEY, CARRIE S. COX, MICHAEL A. FRIEDMAN, JULIA A. HALLER, PATRICIA HEMINGWAY HALL, JAMES J. LOUGHLIN, ERNEST MARIO, JOHN H. WEILAND, BRISTOL-MYERS SQUIBB COMPANY, and BURGUNDY MERGER SUB, INC.,<br><br>                Defendants. | Civil Action No:<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Sam B. Gerold ("Plaintiff"), on behalf of himself, by his undersigned attorneys, for his complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiff, on behalf of himself and all other similarly situated public stockholders of Celgene Corporation ("Celgene" or the "Company") against the above-captioned Defendants, including Celgene and the members of the Company's Board of Directors (referred to as the "Board" or the "Individual Defendants," and, together with Celgene, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of Celgene by Bristol-Myers Squibb Company.

2.      On January 2, 2019, Celgene, Bristol-Myers Squibb Company ("BMS" or "Parent"), Burgundy Merger Sub, Inc., a direct wholly-owned Subsidiary of Parent ("BM Merger Sub") entered into an Agreement and Plan of Merger (the "Merger Agreement").

3.      Pursuant to the Merger Agreement: BM Merger Sub will merge with and into Celgene, with Celgene surviving the merger and becoming a wholly-owned Subsidiary of Parent (the "Proposed Transaction").

4.      On February 1, 2019, in order to convince Celgene's public common stockholders to vote in favor of the Proposed Transaction, Parent jointly filed a materially incomplete and misleading Form S-4 Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      As stated in the Proxy, upon completion of the Proposed Transaction, current Celgene stockholders will own approximately 31% of the combined company and current BMS stockholders will own approximately 69% of the combined company (the "Merger Consideration").

6.      The Proxy contains materially incomplete and misleading information concerning: (a) the valuation analyses prepared by the Company's financial advisors, J. P. Morgan Securities LLC ("JPM") and Citigroup Global Markets, Inc. ("Citi"), in support of their fairness opinion and (b) the potential conflicts of interest faced by the Board during the sales process leading up to the Proposed Transaction.

7.      Additionally, the Proxy disclosed that the special meeting of Celgene's

stockholders to vote on the Proposed Transaction will be held on April 12, 2019 (the "Stockholder Vote").  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Stockholder Vote so Celgene stockholders can properly exercise their corporate suffrage rights.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (a) the conduct at issue will have an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; and (c) certain Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

11.      ***Plaintiff Sam B. Gerold*** is, and at all relevant times, has been a Celgene stockholder.

3

**Defendants**

12.     ***Defendant Celgene Corporation.*** ("Celgene") is a Delaware corporation with its principal executive offices located at 86 Morris Avenue, Summit, New Jersey, 07901.  Celgene is an integrated global biopharmaceutical company engaged primarily in the discovery, development and commercialization of innovative therapies for the treatment of cancer and inflammatory diseases.  Celgene common stock is traded under the ticker symbol "CELG".

13.     ***Defendant Mark J. Alles*** ("Alles") is, and has been at all relevant times, a director of the Company, and currently serves as the Company's Chairman and Chief Executive Officer ("CEO").

14.     ***Defendant Richard W. Barker*** ("Barker") is, and has been at all relevant times, a director of the Company.

15.     ***Defendant Hans Bishop*** ("Bishop") is, and has been at all relevant times, a director of the Company.

16.     ***Defendant Michael W. Bonney*** ("Bonney") is, and has been at all relevant times, a director of the Company.

17.     ***Defendant Michael D. Casey*** ("Casey") is, and has been at all relevant times, a director of the Company.

18.     ***Defendant Carrie S. Cox*** ("Cox") is, and has been at all relevant times, a director of the Company.

19.     ***Defendant Michael A. Friedman*** ("Friedman") is, and has been at all relevant times, a director of the Company.

20.     ***Defendant Julia A. Haller*** ("Haller") is, and has been at all relevant times, a director of the Company.

21.     **Defendant Patricia Hemingway Hall** ("Hall") is, and has been at all relevant times, a director of the Company.

22.     **Defendant James J. Loughlin** ("Loughlin") is, and has been at all relevant times, a director of the Company.

23.     **Defendant Ernest Mario** ("Mario") is, and has been at all relevant times, a director of the Company.

24.     **Defendant John H. Weiland** ("Weiland") is, and has been at all relevant times, a director of the Company.

25.     The parties in paragraphs 13 through 24 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants".

26.     **Defendant Bristol-Myers Squibb Company** is a Delaware corporation with its principal executive offices located at 840 Newport Center Drive, Newport Beach, CA 92660, and is a party to the Merger Agreement.

27.     **Defendant Burgundy Merger Sub, Inc.** ("CPT Merger Sub") is a Delaware corporation and a direct wholly-owned Subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public stockholders of Celgene (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

29.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable.  As

of January 29, 2019, there were 701,024,507 shares of Celgene common stock outstanding and restricted stock units that will immediately vest upon closing, held by hundreds to thousands of individuals and entities scattered throughout the country.   The actual number of public stockholders of the Company will be ascertained through discovery;

(b)     there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following: (a) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy, in violation of Section 14(a) of the Exchange Act; (b) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (c) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein

with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### The Proposed Transaction

30.    On January 3, 2019, the Company and BMS issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

**Bristol-Myers Squibb to Acquire Celgene to Create a Premier Innovative Biopharma Company**

* * *

**NEW YORK & SUMMIT, N.J.**, January 3, 2019 – Bristol-Myers Squibb Company (NYSE: BMY) and Celgene Corporation (NASDAQ: CELG) today announced that they have entered into a definitive merger agreement under which Bristol-Myers Squibb will acquire Celgene in a cash and stock transaction with an equity value of approximately $74 billion. Under the terms of the agreement, Celgene shareholders will receive 1.0 Bristol-Myers Squibb share and $50.00 in cash for each share of Celgene. Celgene shareholders will also receive one tradeable Contingent Value Right (CVR) for each share of Celgene, which will entitle the holder to receive a payment for the achievement of future regulatory milestones. The Boards of Directors of both companies have approved the combination.

The transaction will create a leading focused specialty biopharma company well positioned to address the needs of patients with cancer, inflammatory and immunologic disease and cardiovascular disease through high-value innovative medicines and leading scientific capabilities. With complementary areas of focus, the combined company will operate with global reach and scale, maintaining the speed and agility that is core to each company's strategic approach.

Based on the closing price of Bristol-Myers Squibb stock of $52.43 on January 2, 2019, the cash and stock consideration to be received by Celgene shareholders at closing is valued at $102.43 per Celgene share and one CVR (as described below). When completed, Bristol-Myers Squibb shareholders are expected to own approximately 69 percent of the company, and Celgene shareholders are expected to own approximately 31 percent.

"Together with Celgene, we are creating an innovative biopharma leader, with leading franchises and a deep and broad pipeline that will drive sustainable

growth and deliver new options for patients across a range of serious diseases," said Giovanni Caforio, M.D., Chairman and Chief Executive Officer of Bristol-Myers Squibb. "As a combined entity, we will enhance our leadership positions across our portfolio, including in cancer and immunology and inflammation. We will also benefit from an expanded early- and late-stage pipeline that includes six expected near-term product launches. Together, our pipeline holds significant promise for patients, allowing us to accelerate new options through a broader range of cutting-edge technologies and discovery platforms."

Dr. Caforio continued, "We are impressed by what Celgene has accomplished for patients, and we look forward to welcoming Celgene employees to Bristol-Myers Squibb. Our new company will continue the strong patient focus that is core to both companies' missions, creating a shared organization with a goal of discovering, developing and delivering innovative medicines for patients with serious diseases. We are confident we will drive value for shareholders and create opportunities for employees."

"For more than 30 years, Celgene's commitment to leading innovation has allowed us to deliver life-changing treatments to patients in areas of high unmet need. Combining with Bristol-Myers Squibb, we are delivering immediate and substantial value to Celgene shareholders and providing them meaningful participation in the long-term growth opportunities created by the combined company," said Mark Alles, Chairman and Chief Executive Officer of Celgene. "Our employees should be incredibly proud of what we have accomplished together and excited for the opportunities ahead of us as we join with Bristol-Myers Squibb, where we can further advance our mission for patients. We look forward to working with the Bristol-Myers Squibb team as we bring our two companies together."

\* \* \*

**Terms and Financing**

Based on the closing price of Bristol-Myers Squibb stock on January 2, 2019, the cash and stock consideration to be received by Celgene shareholders is valued at $102.43 per share. The cash and stock consideration represents an approximately 51 percent premium to Celgene shareholders based on the 30-day volume weighted average closing stock price of Celgene prior to signing and an approximately 54 percent premium to Celgene shareholders based on the closing stock price of Celgene on January 2, 2019. Each share also will receive one tradeable CVR, which will entitle its holder to receive a one-time potential payment of $9.00 in cash upon FDA approval of all three of ozanimod (by December 31, 2020), liso-cel (JCAR017) (by December 31, 2020) and bb2121 (by March 31, 2021), in each case for a specified indication.

31.     The Merger Consideration is unfair because, among other things, the intrinsic value of the Company is in excess of the amount the Company's stockholders will receive in connection with the Proposed Transaction.

32.     It is therefore imperative that the Company common stockholders receive the material information that Defendants have omitted from the Proxy so that they can meaningfully assess whether the Proposed Transaction is in their best interests prior to the vote.

## THE MERGER AGREEMENT

33.     Section 6.02 of the Merger Agreement provides for a "no solicitation" clause that prevents Celgene from soliciting alternative proposals and constrains its ability to negotiate with potential buyers:

Section 6.02   No Solicitation

(a)     From the date of this Agreement until the earlier of the Merger Effective Time and the termination of this Agreement, except as otherwise set forth in this Section 6.02, the Company shall not, and shall cause its Subsidiaries and its and its Subsidiaries' directors and officers to not, and shall use its reasonable best efforts to cause its and its Subsidiaries' other Representatives to not, directly or indirectly, (i) solicit, initiate or take any action to knowingly facilitate or knowingly encourage (including by way of furnishing information) the submission of any Company Acquisition Proposal, (ii) enter into or participate in any discussions or negotiations with, furnish any information relating to the Company or any of its Subsidiaries or afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, knowingly facilitate or knowingly encourage any effort by, any Third Party that the Company knows is seeking to make, or has made, a Company Acquisition Proposal, (iii) (A) withdraw or qualify, amend or modify in any manner adverse to Parent, the Company Board Recommendation, (B) fail to include the Company Board Recommendation in the Joint Proxy Statement/Prospectus or (C) recommend, adopt or approve or publicly propose to recommend, adopt or approve any Company Acquisition Proposal (any of the foregoing in this clause (iii), a "Company Adverse Recommendation Change"), or (iv) take any

action to make any "moratorium", "control share acquisition", "fair price", "supermajority", "affiliate transactions" or "business combination statute or regulation" or other similar anti-takeover laws and regulations of the State of Delaware, including Section 203 of the DGCL, inapplicable to any Third Party or any Company Acquisition Proposal.

(b)     Notwithstanding the foregoing, if at any time prior to the receipt of the Company Stockholder Approval (the "Company Approval Time") (and in no event after the Company Approval Time), the Board of Directors of the Company receives a bona fide written Company Acquisition Proposal made after the date hereof which has not resulted from a violation of this Section 6.02, the Board of Directors of the Company, directly or indirectly through its Representatives, may (x) contact the Third Party that has made such Company Acquisition Proposal in order to ascertain facts or clarify terms for the sole purpose of the Board of Directors of the Company informing itself about such Company Acquisition Proposal and such Third Party and (y) subject to compliance with this Section 6.02(b), Section 6.02(c) and Section 6.02(e), (i) engage in negotiations or discussions with any Third Party that, subject to the Company's compliance with Section 6.02(a), has made after the date of this Agreement a Company Superior Proposal or an unsolicited bona fide written Company Acquisition Proposal that the Board of Directors of the Company determines in good faith, after consultation with its financial advisor and outside legal counsel, is or could reasonably be expected to lead to a Company Superior Proposal, (ii) furnish to such Third Party and its Representatives and financing sources nonpublic information relating to the Company or any of its Subsidiaries pursuant to a confidentiality agreement with confidentiality and use provisions no less favorable and other provisions no less favorable in the aggregate, in each case, to the Company than those contained in the Confidentiality Agreement, a copy of which shall be provided, promptly after its execution, to Parent for informational purposes; provided that all such non-public information (to the extent that such information has not been previously provided or made available to Parent) is provided or made available to Parent, as the case may be, substantially concurrently with the time it is provided or made available to such Third Party, and (iii) following receipt of a Company Superior Proposal after the date of this Agreement, (A) make a Company Adverse Recommendation Change and/or (B) terminate this Agreement in accordance with Section 10.01(d)(iii) to enter into a definitive agreement providing for such Company Superior Proposal, but in the case of this clause (iii) only if the Board of Directors of the Company determines in good faith, after

consultation with the Company's outside legal counsel and financial advisor, that the failure to take such action would be reasonably likely to be inconsistent with its fiduciary duties under Applicable Law. Nothing contained herein shall prevent the Board of Directors of the Company from (x) complying with Rule 14e-2(a) under the 1934 Act with regard to a Company Acquisition Proposal, so long as any action taken or statement made to so comply is consistent with this Section 6.02, or (y) making any required disclosure to the stockholders of the Company if the Board of Directors of the Company determines in good faith, after consultation with its outside legal counsel, that the failure to take such action would be reasonably likely to be inconsistent with Applicable Law; provided that any Company Adverse Recommendation Change involving or relating to a Company Acquisition Proposal may only be made in accordance with the provisions of this Section 6.02(b), Section 6.02(c) and Section 6.02(e). A "stop, look and listen" disclosure or similar communication of the type contemplated by Rule 14d-9(f) under the 1934 Act shall not be a Company Adverse Recommendation Change.

(c)     In addition to the requirements set forth in Section 6.02(b), the Board of Directors of the Company shall not take any of the actions referred to in clauses (i) through (iii) of Section 6.02(b) unless the Company shall have first delivered to Parent written notice advising Parent that the Company intends to take such action. The Company shall notify Parent as promptly as practicable (but in no event later than forty eight (48) hours) after receipt by the Company (or any of its Representatives) of any Company Acquisition Proposal or any request for information relating to the Company or any of its Subsidiaries or for access to the business, properties, assets, books or records of the Company or any of its Subsidiaries by any Third Party that, to the knowledge of the Company, is reasonably likely to make or has made any Company Acquisition Proposal, which notice shall be provided in writing and shall identify the Third Party making, and the material terms and conditions of, any such Company Acquisition Proposal or request. The Company shall thereafter (x) keep Parent reasonably informed, on a reasonably current basis, of any material changes in the status and details of any such Company Acquisition Proposal or request and (y) as promptly as practicable (but in no event later than twenty four (24) hours after receipt) provide to Parent copies of all material correspondence and written materials sent or provided to the Company or any of its Subsidiaries that describes any terms or conditions of any Company Acquisition Proposal (as well as written summaries of any material oral communications relating to

the terms and conditions of any Company Acquisition Proposal).

(d)     Notwithstanding anything in this Agreement to the contrary, at any time prior to the Company Approval Time (and in no event after the Company Approval Time), the Board of Directors of the Company may effect a Company Adverse Recommendation Change involving or relating to a Company Intervening Event if the Board of Directors of the Company determines in good faith, after consultation with its outside legal counsel, that the failure to take such action would be reasonably likely to be inconsistent with its fiduciary duties under Applicable Law; provided that (i) the Company shall first notify Parent in writing of its intention to take such action, which notice shall include a reasonably detailed description of such Company Intervening Event, (ii) if requested by Parent, the Company and its Representatives shall discuss and negotiate in good faith with Parent and its Representatives (to the extent that Parent desires to so negotiate) during the four (4) Business Day period following such notice regarding any proposal by Parent to amend the terms of this Agreement in response to such Company Intervening Event, and (iii) the Board of Directors of the Company shall not effect any Company Adverse Recommendation Change involving or relating to a Company Intervening Event unless, after the four (4) Business Day period described in the foregoing clause (ii), the Board of Directors of the Company determines in good faith, after consultation with its outside legal counsel and taking into account any proposal by Parent to amend the terms of this Agreement during such four (4) Business Day period, that the failure to take such action would continue to be reasonably likely to be inconsistent with its fiduciary duties under Applicable Law.

(e)     Without limiting or affecting Section 6.02(a), Section 6.02(b) or Section 6.02(c), the Board of Directors of the Company shall not make a Company Adverse Recommendation Change involving or relating to a Company Superior Proposal or terminate this Agreement to enter into a definitive agreement with respect to a Company Superior Proposal unless (i) the Company first notifies Parent, in writing at least four (4) Business Days before taking such action, that the Company intends to take such action, which notice attaches the most current version of each proposed Contract or other agreement providing for such Company Superior Proposal and the identity of the Third Party(ies) making the Company Superior Proposal, (ii) if requested by Parent, during such four (4) Business Day period, the Company and its Representatives have discussed and negotiated in good faith with Parent (to the extent that Parent desires to so negotiate) regarding any proposal by

Parent to amend the terms of this Agreement in response to such Company Superior Proposal and (iii) after such four (4) Business Day period, the Board of Directors of the Company determines in good faith, after consultation with its financial advisor and outside legal counsel and taking into account any proposal by Parent to amend the terms of this Agreement, that such Company Acquisition Proposal continues to constitute a Company Superior Proposal and that the failure to take such action would continue to be reasonably likely to be inconsistent with its fiduciary duties under Applicable Law (it being understood and agreed that in the event of any amendment to the financial terms or other material terms of any such Company Superior Proposal, a new written notification from the Company consistent with that described in clause (i) of this Section 6.02(e) shall be required, and a new notice period under clause (i) of this Section 6.02(e) shall commence, during which notice period the Company shall be required to comply with the requirements of this Section 6.02(e) anew, except that such new notice period shall be for two (2) Business Days (as opposed to four (4) Business Days)). After delivery of such written notice pursuant to the immediately preceding sentence, the Company shall keep Parent reasonably informed on a reasonably current basis of all material developments affecting the material terms of any such Company Superior Proposal (and the Company shall provide Parent with copies of any additional written materials received that provide for or that are material to such Company Superior Proposal).

(f)     "Company Superior Proposal" means any bona fide, written Company Acquisition Proposal (other than a Company Acquisition Proposal which has resulted from a violation of this Section 6.02) (with all references to "twenty percent (20%)" in the definition of Company Acquisition Proposal being deemed to be references to "fifty percent (50%)") on terms that the Board of Directors of the Company determines in good faith, after consultation with its financial advisor and outside legal counsel, and taking into account all the terms and conditions of the Company Acquisition Proposal that the Board of Directors of the Company considers to be appropriate (including the identity of the Person making the Company Acquisition Proposal and the expected timing and likelihood of consummation, any governmental or other approval requirements (including divestitures and entry into other commitments and limitations), break-up fees, expense reimbursement provisions, conditions to consummation and the availability of necessary financing (including, if a cash transaction (in whole or in part), the availability of such funds and the nature, terms and conditionality of any committed financing), would result

in a transaction (i) that, if consummated, is more favorable to the Company's stockholders from a financial point of view than the Merger (taking into account any proposal by Parent to amend the terms of this Agreement), and (ii) that is reasonably capable of being completed on the terms proposed, taking into account the identity of the Person making the Company Acquisition Proposal, any approval requirements and all other financial, regulatory, legal and other aspects of such Company Acquisition Proposal.

(g)   "Company Intervening Event" means any material event, fact, change, effect, development or occurrence that (i) was not known, or the material consequences of which were not known, in each case to the Board of Directors of the Company as of or prior to the date of this Agreement and (ii) does not relate to or involve any Company Acquisition Proposal.

(h)   The Company shall, and shall cause its Subsidiaries and its and its Subsidiaries' directors and officers to, and shall use its reasonable best efforts to cause its and its Subsidiaries' other Representatives to, cease immediately and cause to be terminated any and all existing activities, discussions or negotiations, if any, with any Third Party conducted prior to the date of this Agreement with respect to any Company Acquisition Proposal or with respect to any indication, proposal or inquiry that could reasonably be expected to lead to a Company Acquisition Proposal and shall use its reasonable best efforts to cause any such party (and any of its Representatives) in possession of confidential information about the Company or any of its Subsidiaries that was furnished by or on behalf of the Company to return or destroy all such information.

34.   In addition, Section 10.03 of the Merger Agreement requires Celgene to pay up to $2.2 billion as a "termination fee" to BMS in the event this agreement is terminated by Celgene and improperly constrains Celgene from obtaining a superior offer.

## THE MATERIALLY INCOMPLETE AND MISLEADING PROXY

35.   On February 1, 2019, Defendants filed an incomplete and misleading Proxy with the SEC and disseminated it to the Company's stockholders.  The Proxy solicits the Company's stockholders to vote in favor of the Proposed Transaction.

36.   Defendants were obligated to carefully review the Proxy before it was filed with

the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.

37.     First, the Proxy describes the fairness opinions of the Company's financial advisors, JPM and Citi, and the various valuation analyses each performed in support of its opinion.  However, the description of JPM's and Citi's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, the Company's stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on JPM's and/or Citi's fairness opinion in determining whether to vote their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's common stockholders.

38.     In its Fairness Opinion, JPM identified five (5) publicly traded companies as peers and calculated estimated 2019 enterprise multiples ("EV/EBITDA" (enterprise value divided by earnings before interest, taxes, depreciation, and amortization)) and price multiples ("P/E" (price to earnings ratio)) for each of these companies.  It does not appear that JPM used a consistent method for selecting the ranges of enterprise multiples and price multiples.  JPM's failure to use a consistent method for selecting the range of these multiples makes the Proxy materially misleading.

39.     Additionally, Defendants (and JPM) failed to provide the earnings per share ("EPS") estimates for Celgene for 2019 in the Proxy.  The projections include revenue, EBITDA, adjusted EBITDA and free cash flow ("FCF").  Because there are no EPS estimates, one cannot apply a more appropriate range of P/E multiples to derive implied value.  This information must be disclosed to make the Proxy not materially misleading to Celgene

stockholders.

40.     In its discounted cash flow ("DCF") analysis, JPM used Celgene's blended projections and a discount rate range of 8.5 – 9%, to derive at its implied value.  JPM stated that it developed the perpetuity growth rate at the end of the forecast period with management's assistance.  Defendants (and JPM) failed to disclose the components of the discount rate range. This information must be disclosed to make the Proxy not materially misleading to Celgene stockholders.

41.     Defendants (and JPM) failed to provide the earnings per share ("EPS") estimates for BMS for 2019 in the Proxy.  The projections include revenue, EBITDA, adjusted EBITDA and free cash flow ("FCF").  Because there are no EPS estimates, one cannot apply a more appropriate range of P/E multiples to derive implied value.  This information must be disclosed to make the Proxy not materially misleading to Celgene stockholders.

42.     In its Fairness Opinion, Citi also failed to provide the earnings per share ("EPS") estimates for Celgene for 2019 in the Proxy.  Because there are no EPS estimates, one cannot apply a more appropriate range of P/E multiples to derive implied value.  This information must be disclosed to make the Proxy not materially misleading to Celgene stockholders.

43.     In its Fairness Opinion, Citi also failed to disclose the components of the discount rate range.  This information must be disclosed to make the Proxy not materially misleading to Celgene stockholders.

44.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming stockholder vote, Plaintiff and the other members of the Class will be unable to make an informed decision regarding whether to

vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 PROMULGATED THEREUNDER

45.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

47.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

48.    Defendants have issued the Proxy with the intention of soliciting the support of stockholders for the Proposed Transaction.  Upon information and belief, each Defendant reviewed and authorized the dissemination of the Proxy, which fails to provide critical information detailed above.

49.     In so doing, Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.  Each Defendant, by virtue of their roles in the Proposed Transaction, was aware of the omitted material information but failed to disclose such information, in violation of Section 14(a).  Defendants therefore had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

50.     The Proxy is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

51.     Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

52.     Defendants violated the securities laws in preparing and reviewing the Proxy. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact violates securities laws.  Defendants and the Individual Defendants chose to omit material information from the Proxy or failed to notice the material omissions in the Proxy upon reviewing it, which the Individual Defendants were required to do in their roles as officers and directors of the Company.

53.     The misrepresentations and omissions in the Proxy are material to Plaintiff and

the Company's other stockholders, each of whom will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

54.     Plaintiff and the Company's other stockholders have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Company's other stockholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT)

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

57.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

58.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

59.     In addition, as set forth in the Proxy sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

60.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

62.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Company's other stockholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

(A)     declaring that the Proxy is materially false and/or misleading;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction until the Proxy is cured;

(C)     in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(D)     directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 4, 2019

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 778-4000
Facsimile: (302) 295-2873
Email: rernst@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South

New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

Of Counsel:
**MOORE KUEHN, PLLC**
Justin Kuehn
30 Wall Street, 8th Floor
New York, NY 10005
Phone: (212) 709-8245
Email: jkuehn@moorekuehn.com